# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **NOVEMBER 19, 2014**

**NO. 32,600**

**SOPURKH KAUR KHALSA,**
**SHAKTI PARWHA KAUR KHALSA, and**
**EK ONG KAR KAUR KHALSA,**
**Trustees of the Yogi Bhajan Administrative Trust,**

Plaintiffs/Counter-Defendants-Appellees,

v.

**INDERJIT KAUR PURI,**

Defendant/Counter-Plaintiff-Appellant,

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sarah M. Singleton, District Judge**

Sanders & Westbrook, P.C.
Maureen A. Sanders
Albuquerque, NM

Wray & Girard, P.C.
Jane Katherine Girard
Katherine Wray
Albuquerque, NM

for Appellees

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Emil J. Kiehne
Albuquerque, NM

The Soni Law Firm
Surjit P. Soni
Pasadena, CA

for Appellant

**OPINION**

**FRY, Judge.**

{1}     This case involves a dispute over the division of the community estate of Harbhajan Singh Khalsa Yogiji, more commonly known as Yogi Bhajan, deceased, and his wife, Defendant Inderjit Kaur Puri, whom the parties refer to as Bibiji. Yogi Bhajan was a spiritual and religious leader of the Sikh religion in the United States. Before Yogi Bhajan's death, the spouses' assets were titled in a trust for the benefit of both spouses. When Yogi Bhajan died, Plaintiffs Sopurkh Kaur Khalsa, Shakti Parwha Kaur Khalsa, and Ek Ong Kar Kaur Khalsa[1] ultimately became trustees of two successor trusts—one for the distribution of Bibiji's half of the community estate and one for the distribution of Yogi Bhajan's half. Bibiji claimed that the trustees breached their fiduciary duties to her in a number of ways such that she was entitled to a reallocation of part of Yogi Bhajan's half of the community estate. Following years of litigation and a five-day trial, the district court rejected Bibiji's claims and concluded that the trustees had not breached any duties owed to Bibiji. For the reasons that follow, we affirm.

[1]Because Plaintiffs and several witnesses share the same last name, we refer to them by their first names in this Opinion.

## BACKGROUND

**The Estate Plan**

{2}     The present controversy springs from the estate plan developed for Yogi Bhajan and Bibiji by attorney Kate Freeland in 1979 or 1980. For this estate plan, Freeland prepared wills for each spouse and a living trust. After the tax laws changed in 1986, Freeland prepared an amendment and restatement of the initial living trust, and the spouses executed that document in 1987. We refer to this document as the Living Trust.

{3}     Under the Living Trust, Yogi Bhajan and Bibiji were the trustors, and Yogi Bhajan was the sole trustee. The Living Trust gave Yogi Bhajan broad powers as trustee, including the power, within his discretion, to invest or reinvest the properties comprising the trust estate; to make loans; to sell, lease, exchange, or make contracts concerning real or personal property; to develop real estate; to "continue to hold, operate, sell or liquidate any business enterprise"; and to "borrow money and to encumber or hypothecate trust property."

{4}     The Living Trust provided for a plan of distribution upon the death of either trustor. If Yogi Bhajan predeceased Bibiji, Bibiji's community property interest in cash or cash equivalents would be held in a separate trust for her benefit, which we call the Survivor's Trust. In addition, the Living Trust's interest in certain real

2

properties would continue to be held in trust (the Property Trust) for Bibiji during her lifetime, and the Living Trust's interest in two other real properties would be distributed to Siri Singh Sahib of Sikh Dharma Brotherhood. The remaining Living Trust assets would first be used to pay taxes and the expenses associated with Yogi Bhajan's last illness and funeral and then to fund a trust to be paid to Yogi Bhajan's assistants designated in a separate written instrument.

**The 2004 Amendment to the Living Trust**

{5}    In 2004, at Freeland's urging, the spouses amended the Living Trust in three ways pertinent to this appeal. First, the amendment changed the disposition of real property such that, if Yogi Bhajan predeceased Bibiji, (a) the Living Trust's interest in real property in India and Los Angeles, California, would go to Bibiji's share of the trust; (b) real property in Espanola, New Mexico, had "already been donated to charity, subject to the right of [Bibiji] and Yogi Bhajan to live there for their lives"; and (c) as a result of the preceding, there would be no Property Trust. Freeland testified that the Los Angeles property was part of the community estate and that she believed the property in India was Yogi Bhajan's separate property. Thus, the amendment provided that, if Yogi Bhajan predeceased Bibiji, Bibiji would receive not only her half interest in the Los Angeles community real property but also Yogi

3

Bhajan's half interest in that property, and she would receive Yogi Bhajan's interest in his separate real property in India.

{6} Second, the amendment provided that "[Bibiji's] community property interest in royalties, royalty agreements, patents, licenses, and other intellectual properties" would be treated the same as cash or cash equivalents. In other words, if Yogi Bhajan predeceased Bibiji, Bibiji would receive her one-half community property interest in these intellectual properties. The previous version of the Living Trust had not made any provision for Bibiji to receive her community property interest in royalty payments, which had increased dramatically after the Living Trust was first amended.

{7} Third, the amendment stated that Yogi Bhajan and Bibiji agreed that upon Yogi Bhajan's death, his community interest in the trust assets (apart from the real property in Los Angeles and India, which would go to Bibiji) would be distributed as he would direct in a separate written document. Yogi Bhajan and Bibiji further agreed that the successor co-trustees, upon the death of either spouse, would be Shakti, Sopurkh, and Kamaljit Kur Kohli. Shakti and Sopurkh worked as Yogi Bhajan's assistants for many years. Kamaljit is the daughter of Yogi Bhajan and Bibiji.

{8} Several months after executing the 2004 amendment, Yogi Bhajan executed a written document entitled "Direction for Distribution of Yogi Bhajan's Share of Trust," which provided that, upon Yogi Bhajan's death, all of his interest in YB

4

Teachings, LLC, would be donated to the non-profit Kundalini Research Institute, and that all of his remaining interest in the Living Trust's assets (apart from the Los Angeles and India properties) would be distributed as follows: (1) to make up the difference between $125,000 and what Yogi Bhajan had already gifted to an education savings plan for a young child, Dharam Dev Kaur Khalsa; and (2) to an LLC organized for the purpose of distributing specified income percentages to fifteen named individuals, including Shakti and Sopurkh. The fifteen individuals would be members of the LLC and would be required to maintain a lifestyle consistent with Yogi Bhajan's teachings and values. Upon the death of a member, the member's share would be paid to the Legacy of Yogiji Foundation. The LLC contemplated by this document (the Staff LLC) was created in the fall of 2004. The parties refer to this trust, created to benefit Yogi Bhajan's staff, as the Administrative Trust.

**Events Following Yogi Bhajan's Death**

{9}   Yogi Bhajan died on October 6, 2004. Harijot Kaur Khalsa, the bookkeeper for the Living Trust since its inception, immediately closed down the bank accounts and opened two new accounts—one for the Survivor's Trust and one for the Administrative Trust. Freeland, who had been hired as legal counsel by the successor trustees, and the trustees met with members of Yogi Bhajan's family and members of the Staff LLC to discuss distribution of the Living Trust's assets. Relying on the

5

records Harijot had kept for the previous twenty to thirty years, the trustees assembled the assets and distributed Bibiji's interest to the Survivor's Trust. Most of the assets had been distributed either to Bibiji or to the Administrative Trust by the end of 2004.

{10} In May 2005, Bibiji's attorney wrote to Freeland and asserted that Yogi Bhajan had made charitable contributions from 1996 to 2004 without Bibiji's knowledge or consent. The letter went on to request a credit in half the amount of these contributions and asked for information regarding charitable contributions made prior to 1996 and regarding intellectual property owned by the Living Trust. In light of Bibiji's claims, Freeland and Bibiji's attorney agreed that it would be inappropriate for Bibiji's daughter, Kamaljit, to remain as a trustee of the Administrative Trust and for Shakti and Sopurkh to continue as trustees of the Survivor's Trust. Kamaljit was replaced by Ek Ong Kar Kaur as the third trustee of the Administrative Trust. Shakti and Sopurkh resigned as trustees for the Survivor's Trust. We refer to Shakti, Sopurkh, and Ek Ong Kar Kaur as the Trustees.

**Initiation of Litigation**

{11} Freeland, on behalf of the Trustees, requested backup information for Bibiji's claims. In the ensuing months, the Trustees continued to request explanations for and details of Bibiji's claims, but they did not receive any. The Trustees made no further distributions of estate assets in light of Bibiji's claims. The Trustees ultimately filed

6

the present action seeking a judgment declaring what, if anything, was owed to Bibiji beyond what had already been distributed to her. Bibiji filed a counterclaim seeking an accounting, removal of certain Trustees, and damages for breach of the trust and breach of fiduciary duties. After nearly two years of litigation, the district court dismissed the Trustees' complaint for declaratory relief due to lack of controversy. The case then proceeded to trial on Bibiji's counterclaim.

{12}     The district court heard five days of testimony and received over 500 exhibits. Bibiji did not testify. After taking the matter under advisement, the district court found in favor of the Trustees on all claims and dismissed "all claims which have been or could have been brought by [Bibiji] in this case." It further found that "[j]ustice and equity require that [Bibiji] pay the reasonable attorney fees incurred by [the Trustees]." The amount of attorney fees was to be determined at a later time. This appeal followed.

**DISCUSSION**

{13}     Bibiji raises nine issues on appeal, which we consolidate into three issues. First, Bibiji maintains that the district court erred in finding that the Trustees did not breach their fiduciary duties to her as a beneficiary of the Living Trust in a variety of ways. Second, she claims that the district court made several procedural errors.

Third, she contends that the district court erred in determining that the Trustees were entitled to recover their reasonable attorney fees.

## 1.     The Trustees' Alleged Breaches of Fiduciary Duties

{14}     Bibiji argues that the Trustees breached their fiduciary duties by (a) failing to investigate and inventory the Living Trust's assets, (b) improperly managing assets and conspiring to deprive Bibiji of income from a license of trademarks, (c) ignoring conflicts of interest, and (d) failing to reallocate trust assets to account for Yogi Bhajan's alleged improper dissipation of community property.  While the last two issues include discrete questions of law, the thrust of Bibiji's claims related to the Trustees' alleged breaches of duty concern whether substantial evidence supports the district court's findings that no such breaches occurred.  We reject Bibiji's contention that these issues involve mixed questions of fact and law requiring de novo review.

{15}     Substantial evidence is "relevant evidence that a reasonable mind could accept as adequate to support a conclusion." *Deutsche Bank Nat'l Trust Co. v. Beneficial N.M. Inc.*, 2014-NMCA-090, ¶ 7, 335 P.3d 217 (internal quotation marks and citation omitted), *cert. granted sub nom. Deutsche Bank v. Johnston*, 2014-NMCERT-008, 334 P.3d 425.  In reviewing a substantial evidence argument, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City*

*of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "[W]e will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Id*. "We consider the evidence in the light most favorable to the prevailing party and disregard any inferences and evidence to the contrary." *Deutsche Bank*, 2014-NMCA-090, ¶ 7.

{16} Before turning to Bibiji's specific claims, we clarify that the Trustees did not become trustees until Yogi Bhajan died. Until that point, all of the assets in the Living Trust were administered by Yogi Bhajan as the sole trustee. Once Yogi Bhajan died, two trusts came into existence: the Survivor's Trust, of which Bibiji was the sole beneficiary, and the Administrative Trust, of which the Staff LLC and the Legacy of Yogiji Foundation were the beneficiaries. Trustees Shakti and Sopurkh owed duties to the beneficiaries of both trusts until 2005, when they resigned as trustees of the Survivor's Trust in light of Bibiji's claims. After their resignation, they owed duties only to the beneficiaries of the Administrative Trust.

{17} The Living Trust contained provisions guiding the actions of the Trustees in administering the Administrative Trust. The Living Trust granted the same broad powers of administration to the Trustees that Yogi Bhajan had enjoyed as the sole trustee of the Living Trust during his lifetime. These powers included the power to invest and reinvest the trust estate; to make loans; to sell, exchange, or lease property; to hold securities; to improve real estate; to employ attorneys, accountants, and other

9

agents; and to budget the trust's estimated annual income and expenses "in such manner as to equalize, as far as practical, periodic income payments to beneficiaries."

{18}     Underlying all of Bibiji's claims against the Trustees is the undisputed legal premise that the Trustees had the obligation to administer the trusts "in good faith" and "in accordance with [their] terms and purposes and the interests of the beneficiaries." NMSA 1978, § 46A-8-801 (2003). Because the trusts had more than one beneficiary, the Trustees were required to "act impartially . . . giving due regard to the beneficiaries' respective interests." NMSA 1978, § 46A-8-803 (2003). The Trustees had the duty to "administer the trust[s] as a prudent person would, by considering the purposes, terms, distributional requirements and other circumstances of the trust[s]" and "exercise reasonable care, skill and caution." NMSA 1978, § 46A-8-804 (2003). In addition, the Trustees had the obligation to "take reasonable steps to take control of and protect the trust property." NMSA 1978, § 46A-8-809 (2003).

{19}     To clarify, upon the death of Yogi Bhajan, the then-trustees owed these fiduciary duties to Bibiji as a beneficiary of the Living Trust's assets to ensure that Bibiji received all of the assets that the Living Trust directed to be placed in the Survivor's Trust. Once these assets were transferred to the Survivor's Trust, the then-trustees' fiduciary duties to Bibiji continued because, at least initially, they were the trustees of the Survivor's Trust. However, once Shakti and Sopurkh resigned as

10

trustees of the Survivor's Trust in August or September 2005, they no longer owed Bibiji any fiduciary duties. At that point, they were trustees of only the Administrative Trust, and their fiduciary duties were owed to the beneficiaries of that trust—the members of the Staff LLC and the Legacy of Yogiji Foundation.

{20} With all of this in mind, we turn to Bibiji's claims.

**a.     Duties to Investigate and Inventory Trust Assets**

{21} Bibiji argues that the Trustees breached their duties to investigate and inventory trust assets because they admitted that they did not investigate whether the Living Trust or Yogi Bhajan had owned any assets other than those listed in the records maintained by Harijot. Bibiji claims that she identified eighteen categories of assets not reflected in Harijot's records, including real estate, jewelry, swords, minerals, books published by Yogi Bhajan, video lectures, trademarks, trade secrets, formulas, recipes, and paintings by Yogi Bhajan.

{22} The district court made numerous findings of fact regarding Bibiji's assertions in this regard. The court found that Yogi Bhajan initially hired Harijot to prepare a general ledger for the Living Trust in 1982 and that from 1982 until Yogi Bhajan's death, "Harijot had spent decades ensuring that all of Yogi Bhajan and Bibiji's community property and separate assets were properly transferred to and titled in the Living Trust, and inventoried on the Living Trust's general ledgers." Harijot was

11

assisted in this endeavor by Freeland and by Shakti, who was Yogi Bhajan's executive secretary, all of whom communicated regularly over the years in order to ensure that all assets were transferred and titled in the Living Trust during Yogi Bhajan's lifetime. The district court also found that the intellectual property at issue had been properly inventoried and that Bibiji's share of this property had been appropriately distributed.

{23}    Substantial evidence through the testimony of Harijot and Freeland and through exhibits supported these findings. Both Harijot and Freeland testified that they regularly strived to ensure that all new assets were transferred to the Living Trust. As for the broad categories of assets that Bibiji argues were overlooked, Freeland testified that she was aware that "Yogi Bhajan was a prolific author, creator of recipes, trademarks, business assets and the like" and that she attempted to ensure that those assets were listed as part of the Living Trust estate. The estate tax return included detailed schedules listing the Living Trust's real estate; stocks and bonds; mortgages, notes, and cash; life insurance; miscellaneous property, which included the name and likeness of Yogi Bhajan, royalty contracts, business interests, vehicles, jewelry, furs, and personal effects; and annuities. As for weapons and paintings, Freeland testified that she understood that these were gifts to Yogi Bhajan in his capacity as head of the church, which would make them separate property, and they

12

were placed in the church archives. The district court made a finding to this effect based on this testimony.

{24} The Trustees' expert CPA testified that the records he reviewed reflected a professional and complete accounting of the community's assets, and that all of the assets of the Living Trust properly made their way into the Survivor's Trust and the Administrative Trust after Yogi Bhajan's death. All of this testimony supports the district court's view that, in accordance with Section 46A-8-804, the Trustees conducted the inventory and transfer of Living Trust assets as a prudent person would and in a reasonable manner. Given Harijot's careful record keeping over the years, there would be no reason for the Trustees to believe that additional assets might exist. Viewing the record in the light most favorable to the Trustees, as our standard of review requires us to do, we conclude that substantial evidence supports the district court's determination that the Trustees did not breach any fiduciary duties in their investigation of assets.

**b.     Management of Assets**

{25} Bibiji claims that the Trustees breached various duties in their management of the licensing of trademarks. During Yogi Bhajan's lifetime, the Living Trust had entered into a licensing agreement with Golden Temple of Oregon, Inc. (Golden Temple), for the use of trademarks for the name and likeness of Yogi Bhajan on

13

specified cereals, teas, and body care products. Under the agreement, Golden Temple agreed to pay to the Living Trust royalties of between 0.10 percent and 3.5 percent of Golden Temple's gross sales. When Yogi Bhajan died, Harijot told Golden Temple to divide its royalty payments and pay one-half to the Survivor's Trust and one-half to the Administrative Trust because the license agreement was community property. In about 2008, Golden Temple discontinued use of Yogi Bhajan's name and likeness but continued to use the names "Yogi" and "Yogi Tea." It stopped paying royalties.

{26}    There was a similar licensing agreement between the Living Trust and Amalgamated Sales Corp., Ltd. for the use of Yogi Bhajan's name and likeness on teas distributed in northern Africa and Europe. Like Golden Temple, Amalgamated stopped paying royalties in about 2008. The Trustees did not sue Amalgamated because there were no funds coming into the Administrative Trust, which could not afford to take on another lawsuit in light of the present litigation. Instead of suing, the Trustees entered into a tolling agreement with Amalgamated, which provided that the Trustees would not sue during a specified period of time and that the delay would not count toward the applicable statute of limitations. The Trustees believed they were protecting the continuation of the Administrative Trust by entering into this agreement. At some point, Amalgamated transferred its assets to Golden Temple,

14

which meant that a successor tolling agreement regarding the trademarks licensed to Amalgamated was between the Trustees and Golden Temple.

{27} As for the trademarks initially licensed to Golden Temple, the Trustees sent a letter of default to Golden Temple, and Golden Temple then resumed royalty payments. Bibiji, as half owner of the trademarks, pursued Golden Temple by way of an arbitration to determine ownership of the "Yogi" trademarks, and she suggested that the Trustees participate. The Trustees declined, seemingly in part because they thought that the term "Yogi" was a generic term rather than a trademark and in part because they did not feel the Administrative Trust had the funds to take on any more litigation, given the continuing litigation in the case now before us. Bibiji's arbitration was successful, and the arbitrators determined that Golden Temple had no right to the "Yogi" trademarks and that it had infringed the trademarks. They awarded Bibiji her half interest in the royalty payments that Golden Temple should have paid.

{28} After the arbitration award, Golden Temple sought to negotiate a new license of the trademarks. Initially, the Trustees and Bibiji took the position that they were willing to grant Golden Temple a non-perpetual, non-worldwide license. Golden Temple offered to pay a flat 3 percent royalty, with a minimum royalty payment of $2 million and a maximum of $4 million per year, an offer to which both Bibiji and

15

the Trustees objected. Negotiations then broke down, but the Trustees alone continued to negotiate with Golden Temple.

{29} Ultimately, the Trustees, representing the Administrative Trust's half interest in the Yogi, Yogi Tea, and other trademarks, entered into an interim licensing agreement with Golden Temple in October 2011. The agreement provided that Golden Temple would pay back royalties to the Administrative Trust as calculated in the arbitration award to Bibiji and future royalties calculated according to the same formula applied in the arbitration award. The agreement was to remain in effect until either (a) the execution of an agreement whereby Golden Temple would purchase the Administrative Trust's interest in the trademarks or (b) the agreement was terminated by either party upon 180 days prior written notice. Under the agreement, Golden Temple was required to offer the same terms to Bibiji for her half interest in the trademarks, but Bibiji rejected the offer. The agreement further provided that Golden Temple would indemnify the Administrative Trust from any damages resulting from claims by Bibiji arising from the Administrative Trust entering into the agreement.

{30} Future royalties under the agreement would be paid by Golden Temple at the same rate that was payable under the 2004 license agreement, which was 3.5 percent, stepping down to 0.5 percent on sales exceeding $25 million. This was lower than the flat 3 percent rate Golden Temple offered during negotiations when Bibiji was

16

participating. The Trustees agreed to accept the lower royalty rate because there was concern about Golden Temple having a deadline to its use of the trademark, and the Trustees were very interested in keeping the trademark viable with a company that had experience with selling Yogi Tea under the trademark. If the district court approved of a sale, the Trustees planned to sell the Administrative Trust's undivided half interest in the trademarks to Golden Temple for $9.7 million, and the sale proceeds would be distributable to the Staff LLC.

{31} At some point prior to the execution of the interim licensing agreement, the Trustees learned that Bibiji believed she had the opportunity of licensing the trademarks for 6 percent. The Trustees asked for more information about this prospective licensee, but they never received that information from Bibiji or her attorney.

{32} As we understand Bibiji's arguments, she claims that the Trustees mismanaged trust assets when they failed to seek advice from a trademark expert as to who owned the Yogi trademarks and when they declined to enforce the Administrative Trust's contract rights when Golden Temple and Amalgamated suspended royalty payments. Bibiji further contends that the Trustees did not have the power to enter into the new licensing agreement with Golden Temple because the trademarks were never made assets of the Living Trust.

17

{33} We first observe that Bibiji's arguments regarding the trademarks apparently challenge the Trustees' compliance with their fiduciary duties even though the actions at issue occurred long after Shakti and Sopurkh resigned as trustees of the Survivor's Trust. At the time Golden Temple and Amalgamated stopped making royalty payments, the Trustees oversaw only the Administrative Trust, and their duties therefore ran to the beneficiaries of that trust, not to Bibiji. The district court appreciated this distinction. In its written decision, the district court stated that "[p]rior to the transfer to Bibiji of her one-half interest in the [intellectual property] rights, the Trustees did hold that interest in trust for Bibiji, but that interest was transferred in December 2004. Once that transfer was accomplished, the Trustees' fiduciary duties as to that interest ended."

{34} Bibiji's arguments apparently rest on her claim that she is entitled to more than half of the trademark rights. This claim in turn springs from her assertion that she is entitled to a reallocation of Yogi Bhajan's half of the community property due to his alleged excess expenditure of community funds prior to his death. Bibiji's claim for reallocation cannot be characterized as a beneficiary's claim against the Trustees because the trustee/beneficiary relationship between the parties ended in 2005 when Shakti and Sopurkh resigned as trustees of the Survivor's Trust. Rather, Bibiji's claim to reallocation can be characterized as the claim of one spouse against the estate

18

of the other for alleged misappropriation of community property. This is what the district court properly concluded. *Fernandez v. Fernandez*, 1991-NMCA-001, ¶¶ 18-19, 111 N.M. 442, 806 P.2d 582 (explaining that a gift made by one spouse in breach of his or her fiduciary duty may result in the wronged spouse's recovery of his or her community share of the gift from the spouse who made the gift).

{35} To the extent that Bibiji is arguing that the Trustees failed to accurately inventory and distribute her half interest in the trademarks, the district court found that all of "Yogi Bhajan's intellectual property interests were properly inventoried and, in accordance with the Living Trust's 2004 amendment, 50 [percent] of Yogi Bhajan's intellectual property was distributed to Bibiji." The district court further found that the intellectual property interests that were the subject of the pre-death licensing agreements with Golden Temple and Amalgamated "were inventoried on the [estate tax return] Form 706 by the contracts themselves, and are specifically listed on the contract exhibits." And the district court found that "all [intellectual property] interests to which Bibiji was entitled were properly and promptly distributed to her, most especially the [Golden Temple] and Amalgamated royalties interests intended to provide Bibiji a stable source of income." These findings were supported by the evidence summarized above and in the preceding section of this Opinion.

{36}    To the extent Bibiji is claiming that the Trustees' interim licensing agreement with Golden Temple and its tolling agreement with Amalgamated somehow negatively impacted her half interest in the Yogi trademarks, the district court viewed the relationship between the parties regarding the trademarks as co-owners. We observe that because Bibiji and the Administrative Trust each owned a one-half interest in the trademarks, this contention of negative impact on Bibiji's trademark interest is in the nature of a claim of trademark infringement by one co-owner against the other, not a claim of breach of fiduciary duty in the trust context. Since the only claims Bibiji asserted against the Trustees were claims of breach of fiduciary duty, these infringement claims seem to be misplaced. Nonetheless, because the parties litigated these claims without objection and because the district court decided them, we address them.

{37}    The district court relied on case law stating that "[a]n owner does not infringe upon his co-owner's rights in a trademark by exercising his own right of use. Likewise, he does not dilute those rights by exercising his own right of use." *Derminer v. Kramer*, 406 F. Supp. 2d 756, 759 (E.D. Mich. 2005). This is legally correct, according to a leading treatise on the subject. "When parties are co-owners of a mark, one party cannot sue the other for infringement. A co-owner cannot

20

infringe the mark it owns." 2 *McCarthy on Trademarks & Unfair Competition* § 16.40 (4th ed. 2014).

{38}     To the extent Bibiji had any claim that the Trustees had any additional duty to her regarding the trademarks, the district court put that claim to rest when it found that "[t]he Trustees' decision to enter into the [i]nterim [l]icensing [a]greement . . . with [Golden Temple] was fiscally sound and preserved the marks' financial potential."  The district court explained that if the Trustees had not entered into the agreement, "[Golden Temple] would have been forced to re-brand, which would have greatly diminished, and potentially destroyed," the potential financial value of the trademarks. These findings are supported by the evidence summarized above. Given the cost of the present litigation to the Administrative Trust, it made sense for the Trustees to preserve the value of the trademarks through the interim licensing agreement and the tolling agreement rather than to expend additional trust funds to pursue litigation against Golden Temple and Amalgamated.  We therefore reject Bibiji's claim that the district court erroneously failed to find that the Trustees mismanaged assets.

**c.     Alleged Conflicts of Interest**

{39}     Bibiji claims that Sopurkh and Shakti had a conflict of interest as soon as Bibiji requested reallocation of the community assets because they were beneficiaries of the

Administrative Trust who would benefit if Bibiji's claims failed. Sopurkh and Shakti indeed withdrew as trustees of the Survivor's Trust when Bibiji asserted her claim. But Bibiji appears to contend that they were also required to withdraw as trustees of the Administrative Trust. Again, we note that Sopurkh and Shakti's fiduciary duties to Bibiji ended when they withdrew as trustees of the Survivor's Trust. Because Bibiji was not a beneficiary of the Administrative Trust, she could not assert a claim that Sopurkh and Shakti remaining as trustees of the Administrative Trust constituted a breach of their fiduciary duties. Furthermore, Bibiji's reallocation claim was a claim of one spouse against the estate of the other spouse, not a claim asserted in the context of a trust relationship.

{40}    To the extent Bibiji is contending that Sopurkh and Shakti's status as beneficiaries by itself constituted a conflict of interest, we affirm the district court's findings to the contrary. The district court found that the Living Trust itself required that only one trustee be independent and not a beneficiary of the Administrative Trust. Ek Ong Kar Kaur is not a beneficiary of the Administrative Trust and, therefore, the Living Trust's requirements are satisfied. These findings are supported by the specific provisions of the Living Trust, which was introduced into evidence, and by other evidence at trial. In addition, the district court found that Sopurkh

22

recused herself from participating in any decisions related to Golden Temple, of which she had once been president. This finding, too, was supported by the evidence.

**d.      Reallocation of Community Property**

{41}      Bibiji's primary contention in the district court and on appeal is that Yogi Bhajan made gifts and charitable contributions of community property during his lifetime without Bibiji's knowledge and consent and that, as a result, Bibiji was entitled to a portion of Yogi Bhajan's half of the community estate in order to make up for these unauthorized dispositions. Bibiji relies on *Roselli v. Rio Communities Service Station, Inc.*, 1990-NMSC-018, 109 N.M. 509, 787 P.2d 428, for the proposition that if a spouse manages community property in a way that violates his or her fiduciary duty to the other spouse, "the aggrieved spouse may have recourse first against the other spouse's property, and then against the donee of the property." Thus, Bibiji claims, the Trustees had the obligation to reallocate portions of Yogi Bhajan's half of the community estate, which ended up in the Administrative Trust, to Bibiji, and the Trustees' failure to do so constituted a breach of their fiduciary duty to her.

{42}      In order to assess Bibiji's claims, we consider the sparse New Mexico case law on the issue. *Roselli* involved a husband who named his son from a prior marriage as the beneficiary of two community-purchased life insurance policies without his

23

wife's knowledge. 1990-NMSC-018, ¶ 2. In a dispute after the husband's death, our Supreme Court reversed summary judgment in favor of the wife on the disposition of the insurance proceeds because issues of fact remained to be resolved. *Id.* ¶ 24. In doing so, the Court established certain legal principles to guide the district court on remand. The Court first acknowledged that by statute, "either spouse alone has the power to manage, control, or dispose of the entire community personal property, unless one spouse is otherwise designated." *Id.* ¶ 18 (citing NMSA 1978, § 40-3-14 (1975)). The Court then reviewed the law in other community property states and established what it called the "best rule" as follows:

> (1)     each spouse has the power to manage and dispose of the community's personal property;
>
> (2)     subject to a fiduciary duty to the other spouse; and
>
> (3)     absent intervening equities, a gift of substantial community property to a third person without the other spouse's consent may be revoked and set aside for the benefit of the aggrieved spouse.

*Roselli*, 1990-NMSC-018, ¶ 23.

{43}     A subsequent case shed additional light on the matter. In *Fernandez*, our Supreme Court suggested factors that could inform the *Roselli* rule, including whether the managing spouse's action furthered "the common benefit of both members of the community[,]" 1991-NMCA-001, ¶ 12, and whether the objectionable gift or expenditure constituted a "substantial portion of the community property." *Id.* ¶ 21.

24

{44} We distill the following principles from *Roselli* and *Fernandez*. First, either spouse may dispose of community property unless the disposition violates the spouse's fiduciary duty to the other spouse. Second, the fiduciary duty in question involves the assessment of the equities of the particular circumstances. Third, in assessing the equities, a court should consider whether the disposition furthers both spouses' common benefit and whether the disposition amounted to a substantial portion of the community property.

{45} The district court in the present case found guidance in the law of Texas, which is also a community property state, and on which our Supreme Court relied in *Roselli*. The district court noted that the applicable Texas law is summarized as follows:

> In the absence of fraud on the rights of the other spouse, a spouse has the right to control and dispose of community property subject to his sole management. . . . The managing spouse has the burden to show that his disposition of the property was fair.
>
> The court will consider three primary factors of 'fairness' in reviewing one spouse's claim of constructive fraud against the other. The factors to be considered are the size of the property disposed of in relation to the total size of the community estate; the adequacy of the estate remaining to support the other spouse after the disposition; and the relationship of the parties involved in the transaction or, in the case of a gift, of the donor to the donee.

*Massey v. Massey*, 807 S.W.2d 391, 401-02 (Tex. App. 1991) (citations omitted). These factors are similar to those we have distilled from *Roselli* and *Fernandez*.

{46} The district court went on to analyze whether Yogi Bhajan breached his fiduciary duty to Bibiji under the framework of three questions: (1) whether the gift was a reasonable one for just cause; (2) whether the property given was excessive compared to the value of the entire community estate; and (3) whether the gift was "in discharge of a legal, moral or civic obligation." The district court derived the first question from Texas law, as stated in *Kemp v. Metropolitan Life Insurance Company*, 205 F.2d 857, 863 (5th Cir. 1953) (stating that "Texas recognizes the right of the [spouse] to make moderate gifts for just causes"). We interpret the notion of "just cause" to be a fair extension of the concept of a gift for the community's common benefit, as stated in *Fernandez*. The second question is consistent with the precepts stated in *Roselli* and *Fernandez*. We find little support in the case law for the third question, so we eliminate it from our consideration.

{47} Because the assessment of these factors involves balancing the equities presented by a particular set of circumstances, we review the district court's determination for abuse of discretion. *See Romero v. Bank of the Sw.*, 2003-NMCA-124, ¶ 28, 135 N.M. 1, 83 P.3d 288 (explaining that "the issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion" (internal quotation marks and citation omitted)).

26

{48} Having established a framework for assessing the district court's findings on the issue of reallocation, we turn to the gifts and charitable contributions that Bibiji found objectionable. It is notable that Bibiji herself never testified at trial and, as a result, information about her objections was supplied indirectly.

{49} Bibiji's expert accountant, David Hinton, testified about how he calculated which gifts and charitable contributions were objectionable. He prepared a report listing the amounts of charitable contributions made by the marital community annually for the years 1981 to 2004 and compared those contributions to the income reported for those years on the spouses' joint income tax returns. Hinton testified that Bibiji would have agreed to 15 percent of total income as an acceptable level of contribution. He calculated that 15 percent of total income for the twenty-three years at issue was $2,248,877 and that actual contributions totaled $5,109,554. Subtracting the former from the latter yielded the sum of $2,860,677. Hinton also provided a list of other gifts of which Bibiji apparently did not approve, totaling $576,260. Adding together Bibiji's half interest in the charitable contributions exceeding 15 percent and in the unapproved gifts yielded the sum of $1,819,950, which Bibiji claimed she was entitled to receive via a reallocation of Yogi Bhajan's half of the community estate.

{50} The district court rejected Bibiji's claim for reallocation for a number of reasons. On the issue of gifts, the court first found that the list of challenged gifts was

27

taken from the Living Trust's accounting entry for non-deductible disbursements, and some of those items were not actually gifts. These non-gift items included a trip that Bibiji herself took to Africa, payments to family members (including Kamaljit, the daughter of Yogi Bhajan and Bibiji), expenses incurred during visits with Indian guests, medical expenses for Yogi Bhajan and members of the Sikh community, and payments for religious services. Harijot's testimony supported these findings of fact.

{51} Also in connection with gifts, the court found that the Trustees were simply unable to accept the contention that Bibiji did not know about and would have objected to them. This was in part because Bibiji's list of unapproved gifts varied from year to year during the course of this litigation, in part because the list contained clearly non-objectionable gifts beneficial to the community, as detailed above, and in part because Bibiji failed to provide specifics regarding her claimed lack of knowledge or consent, despite repeated requests for such information. These findings were also supported by the evidence.

{52} In regard to charitable contributions, the district court found that Bibiji's expert accountant "gave no credit for years in which the contributions were less than 15 percent nor any credit for contributions in excess of 15 percent that Bibiji expressly approved (such as the donation of the ranch in Espanola, to which Bibiji admitted she

28

consented)." The court also found that the expert "failed to account for the tax benefits received by the community as a result of the charitable contributions."

{53} The evidence supported these findings. Hinton testified that for years where charitable contributions were less than 15 percent, he simply noted a zero rather than a negative number, and he never considered the overall effect of using zero in five of the years in question. He also testified that Bibiji approved the donation of the Espanola ranch, valued at $745,000, in 1995, which was more than the total income for that year. However, he did not account for this approved donation in his straight mathematical calculation that any contribution above 15 percent of income was a non-approved contribution. The Trustees' expert accountant testified that the charitable contributions in excess of 15 percent of income resulted in a federal tax savings to the community of $1,118,892 and a state tax savings of $220,543.

{54} In light of these findings regarding gifts and charitable contributions made during Yogi Bhajan's lifetime, the district court then applied the legal analysis of whether the gifts or contributions were reasonable and for just cause and whether the property given was excessive compared to the value of the entire community estate. With respect to gifts, the court found that many of the gifts "were small in comparison to the community estate[,]" that "[i]n the aggregate, the gifts did not violate [Bibiji's] rights[,]" and that "Yogi Bhajan did not breach his spousal fiduciary duty to Bibiji in

29

making the gifts." Given that many of the objectionable gifts actually benefitted the community and the children of Yogi Bhajan and Bibiji, we cannot say that the district court abused its discretion in so finding.

{55} As for the charitable contributions, the district court made several relevant findings, including:

- "Many of the donations were made to non-profit organizations that were involved in the couple's spiritual mission."

- "Bibiji gave implied, if not express, consent to the charitable contributions, particularly in view of the course of conduct of the public life of the couple."

- "The Living Trust's charitable donations, while sizeable, were reasonable in light of the marital community's life mission and for just causes; the donations . . . were not excessive compared to the community estate; and the donations did not leave Bibiji without the means to sustain herself."

{56} Again, these findings were supported by substantial evidence. A cursory review of the charitable contributions made over the years reveals that the vast majority were made to non-profits affiliated with the Sikh religion, including various Sikh Dharma organizations, 3HO Foundation, and the Kundalini Research Institute. Bibiji was the Bhai Sahiba for Sikh Dharma and its affiliates, which meant that she was the authority on the proper practice of the Sikh religion. She was also on the

30

boards of Sikh Dharma Educational Institute and 3HO Foundation and "had a strong interest in promoting the mission of 3HO in the world arena." And, in the opinion of Freeland, Bibiji "has been directly involved in the charitable activities that those [charitable] contributions support. She in turn receives, directly and indirectly, tangible and intangible benefits from her association with the organizations."

{57} The district court's finding that Bibiji impliedly consented to the majority of charitable contributions is further supported by evidence that she and Yogi Bhajan made it their life's mission to support and enhance the Sikh community they had established in the United States after they emigrated from India. Bibiji stated in a letter to the Sikh community:

> My husband and I have built the organization and given millions of dollars of contributions over the years. More than money, we have dedicated our entire lives to these organizations. My husband and I donated the Ranch in Espanola and several other properties we own to the Sikh Dharma.

In addition, Trustee Ek Ong Kar Kaur testified that she was present innumerable times from the early 1970s until Yogi Bhajan's death when donations and charitable giving were discussed in Bibiji's presence. Bibiji signed all of the income tax returns that listed charitable donations. And, because Bibiji sat on the board of many of the donee charitable organizations, including 3HO and the Sikh Dharma Educational Institute, she would have had access to information about the funding of those

31

organizations. Bibiji and Yogi Bhajan subscribed to the tenet of Das Vandh, which is tithing at 10 percent of base income. But 10 percent was a baseline rather than a ceiling for charitable contributions. Yogi Bhajan and Bibiji "encouraged giving by their example, not only to one organization, but over and above Das Vandh, and to other organizations and to help people and other communities that needed help."

{58} The evidence also established that Yogi Bhajan's estate was valued at $6,061,254 and that Bibiji's half of the community property totaled $3,021,632 Bibiji received an additional $706,000 from Yogi Bhajan's half of the community assets, including Yogi Bhajan's half interest in certain real properties and Yogi Bhajan's separate real property in India. Thus, there was substantial evidence that Bibiji's share of the estate, which amounted to more than half, was sufficient to sustain her. Furthermore, Bibiji's half of the objectionable charitable deductions, which were arbitrarily calculated at anything in excess of 15 percent of annual income, totaled $1,430,339 over a period of time exceeding twenty years, while the tax savings attributable to charitable deductions in excess of 15 percent of income totaled $1,141,435.

{59} While Bibiji presented evidence contrary to the evidence summarized above, "when there is a conflict in the testimony, we defer to the trier of fact." *Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M. 498, 953 P.2d 33. "The question is not

32

whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters*, 1997-NMCA-044, ¶ 12. There being considerable evidence supporting the district court's decision under the *Roselli-Fernandez* framework discussed above, we cannot say that the district court abused its discretion in declining to order reallocation of Yogi Bhajan's half of the community assets.

**2.      Alleged Procedural Errors**

{60}     Bibiji claims that the district court made several procedural errors, including: (a) entry of a collateral estoppel order, which precluded full litigation of Bibiji's claims; (b) entry of an overly broad judgment dismissing all claims that have been or could have been brought by Bibiji; and (c) allowing the Trustees to rely on advice of counsel when they failed to assert this theory as an affirmative defense. We are not persuaded.

**a.      Collateral Estoppel Order**

{61}     This claim asserted by Bibiji is entangled with a prior opinion of this Court in related litigation, *In re Estate of Yogiji*, 2013-NMCA-104, 311 P.3d 1224, *cert. denied sub nom. Puri v. Khalsa*, 2013-NMCERT-010, 313 P.3d 250. At some point in the long history of the present litigation, more than four years after Yogi Bhajan's death, Bibiji filed a proceeding in the district court seeking probate of Yogi Bhajan's

will and the appointment of a personal representative. *Id.* ¶ 2. The gist of Bibiji's claim in the probate proceeding was that she wanted a personal representative to investigate what assets Yogi Bhajan owned at the time of his death in an effort to determine whether any assets actually belonged to her. *Id.* ¶ 7. The district court probated the will, appointed a personal representative, and directed the personal representative to determine whether there were any assets other than those that had been identified and distributed by the successor trustees of the Living Trust, the Survivor's Trust, and the Administrative Trust. *Id.* ¶ 8. The district court then limited the personal representative's investigation to assets specifically identified by Bibiji as having questionable title. *Id.* ¶ 9. When the personal representative's investigation revealed no previously unidentified assets, the district court closed the probate proceeding. *Id.* ¶ 13.

{62} The district court in the present case entered its findings of fact and conclusions of law after the district court in the probate case had closed the case before it. Consequently, the district court in the case before us entered the following conclusions of law:

> LL. Bibiji is precluded by the judgment entered in the [p]robate [c]ourt from litigating whether there were any assets belonging to Yogi Bhajan on the date of death, October 6, 2004, which were not identified and distributed by the Trustees.
>
> . . . .

34

NN. Bibiji is precluded from litigating a claim that the Trustees failed to locate and identify property that was owned by Yogi Bhajan at the time of his death . . . because the [p]ersonal [r]epresentative investigated the list of alleged assets that Bibiji provided and found no evidence to support Bibiji's ownership claims regarding other assets.

{63} Following entry of the findings and conclusions in this case, this Court filed an opinion reversing the district court's ruling in the probate case. In that opinion, we analyzed a specific section of the Probate Code and concluded that the district court had interpreted it too narrowly. We stated that "[o]n remand, the personal representative may conduct a complete investigation and inventory of assets in which [Yogi Bhajan] had an interest at the time of his death" and that the personal representative could "confirm title to any assets that are properly in the possession of a devisee, and he may inventory the assets that were properly identified as residue for transfer to the trust." *Id.* ¶ 31. We expressly held that Bibiji's claim for reallocation of assets was off limits in the remanded probate proceeding because that claim was the subject of the case now before us. *Id.*

{64} Bibiji now contends that the district court's conclusions LL and NN "effectively ratified [the] Trustees' determination of what assets [Yogi Bhajan] owned at his date of death and [the] Trustees' distribution of those assets." She further maintains that this Court's reversal of the determination in the probate proceeding in *Estate of Yogiji* "has made clear that there has been no appropriate comprehensive

investigation of [Yogi Bhajan]'s assets and the [d]istrict [c]ourt's . . . findings and conclusions are erroneous."

{65}    We disagree with Bibiji's arguments.  If the personal representative conducts an investigation of assets, which our opinion in *Estate of Yogiji* by no means required, and if the personal representative finds assets that were overlooked by the Trustees in their inventory—a matter of sheer speculation at this point—then those assets will be distributed in accordance with the instructions in the Living Trust.  Any newly discovered assets that are determined to be community property will be distributed half to Bibiji and half to the Administrative Trust.  The likelihood that any new assets will be discovered seems remote because, as the Trustees note in their brief, Bibiji had approximately five years during the course of the present litigation to conduct her own investigation through the discovery process, and she was unable to produce evidence of any asset that had been overlooked in the Trustees' inventory.

**b.    Overly Broad Judgment**

{66}    Bibiji next claims that the district court exceeded its jurisdiction in its judgment, which dismissed "all claims which have been or could have been brought by [Bibiji] in this case, including all claims related to the transactions and occurrences that are the subject matter of the claims alleged in this case."  Bibiji contends that there are pending disputes between her and the Trustees in California federal court

regarding "new breaches of duty in the management of trust assets and the trademarks and [intellectual property] which were not assets of the [Living Trust]."

{67} We do not understand Bibiji's argument. She cites no authority for the proposition that the district court lacked jurisdiction to dismiss Bibiji's claims, and we therefore assume there is no such authority. *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that where a party cites no authority to support an argument, we may assume no such authority exists). The language Bibiji objects to does no more than describe explicitly the normal preclusive effect of any judgment entered after litigation. *Pielhau v. State Farm Mut. Auto. Ins. Co.*, 2013-NMCA 112, 314 P.3d 398. If Bibiji believes the judgment in the present case does not preclude litigation of issues or claims raised in the California court, she can present that view in that court, presumably in response to motions that may be filed by the Trustees in that court.

**c.     Defense of Advice of Counsel**

{68} Bibiji challenges several of the district court's findings that mention the fact that the Trustees hired Freeland to advise them as they administered the transfer of assets from the Living Trust to the two successor trusts and as they attempted to address Bibiji's claims. Bibiji contends that these findings establish that the Trustees raised an "advice of counsel" defense without having first pleaded the defense and

that by allowing this to occur, the district court permitted the Trustees to "sandbag Bibiji and deprive her of the opportunity to engage in discovery and properly prepare her case for trial."

{69} Again, we do not understand Bibiji's argument. As authority, she relies on *Gingrich v. Sandia Corp.*, for the proposition that "when the advice of counsel defense is raised, the party raising the defense must permit discovery of any and all legal advice rendered on the disputed issue." 2007-NMCA-101, ¶ 24, 142 N.M. 359, 165 P.3d 1135 (internal quotation marks and citation omitted). *Gingrich* is inapposite because it involved waiver of attorney-client privilege when the client was relying on its attorney's advice as a defense. Here, the briefs raise no issues involving attorney-client privilege. In addition, there is no suggestion that the Trustees raised advice of counsel as a defense. Instead, they consulted with an attorney to advise them in administering the trusts, as they are permitted to do under NMSA 1978, Section 46A-8-807(A)(1) (2003) (stating that "[a] trustee may delegate duties and powers that a prudent trustee of comparable skills could properly delegate under the circumstances" providing the trustee "exercise[s] reasonable care, skill and caution in . . . selecting . . . agent[s])."

38

## 3. Attorney Fees

{70}     The Trustees asked for an award of attorney fees pursuant to NMSA 1978, Section 46A-10-1004 (2003), which provides:

> In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

In its judgment, the district court stated that justice and equity supported an award to the Trustees of their reasonable attorney fees in accordance with this statute. The amount of the award would be determined after appropriate evidence had been submitted. In this appeal, we are not concerned with the amount of fees awarded but only with the fact that an award was made.

{71}     Bibiji argues that the district court erred in determining that the Trustees were entitled to an award of attorney fees because (1) they waived such an award by failing to ask for it in their pleadings, (2) justice and equity do not require this award, and (3) the award violated Bibiji's due process rights because she did not have the opportunity to brief the issue.

{72}     While there is no New Mexico case law interpreting Section 46A-10-1004, generally speaking, an award of attorney fees is a matter for the district court's discretion. *See Lenz v. Chalamidas*, 1991-NMSC-099, ¶ 2, 113 N.M. 17, 821 P.2d 355 ("Award of attorney fees rests in the discretion of the trial court and this [C]ourt

39

will not alter the fee award absent an abuse of discretion."); *see also Garwood v. Garwood*, 2010 WY 91, ¶ 38, 233 P.3d 977, 986 (Wyo. 2010) (stating that under the Uniform Trust Code, "[o]nce it has been determined that authority exists to award fees and costs, a trial court has extremely broad discretion to rule on the amount of such an award").

{73}    We are not persuaded by Bibiji's argument that the Trustees waived their claim for an award of attorney fees or that she was denied the opportunity to brief the issue. Bibiji has not cited any authority in support of the proposition that a request for attorney fees is waived unless it is pleaded. The Trustees asked for an award in their closing argument brief, and Bibiji could have responded to this request in her closing argument reply brief but failed to do so. Moreover, Bibiji responded in depth to the Trustees' actual motion for attorney fees, which was filed after the judgment was entered. While Bibiji claims that she "might have made different procedural choices or otherwise amended her litigation strategy" if she had known earlier about the Trustees' claim for attorney fees, she does not provide any examples of the alleged prejudice she sustained. We decline to speculate regarding what Bibiji failed to demonstrate.

{74}    On the merits, Bibiji disputes the district court's finding that justice and equity require an award of the Trustees' attorney fees. She maintains that the Trustees'

claim for declaratory judgment was dismissed long before trial, thus making Bibiji the prevailing party, and that the Trustees' "successful defense against Bibiji's claims merely makes this a split result." While she cites cases in which courts have declined to award attorney fees under such circumstances, those same cases reiterate that the decision whether to award fees rests in the trial court's discretion. *See, e.g.*, *Hedicke v. Gunville*, 2003-NMCA-032, ¶ 28, 133 N.M. 335, 62 P.3d 1217 (explaining that "if each party prevails on one claim and loses on one claim, the trial court could and may conclude that neither is ultimately a prevailing party on those claims"); *In re Estate of Foster*, 1985-NMCA-038, ¶ 43, 102 N.M. 707, 699 P.2d 638 (stating that an award of attorney fees, "being equitable[,] depends on the facts of the case and the exercise of equitable power must be used with discretion"). Given the many years of litigation over issues on which Bibiji failed to present any direct evidence to support her claims and in light of the Trustees' overall success in defending these claims, we cannot say that the district court abused its discretion in determining that justice and equity required an award of the Trustees' reasonable attorney fees.

**CONCLUSION**

{75}    For the foregoing reasons, we affirm the district court's judgment.

41

{76}   **IT IS SO ORDERED.**

                                          _____

                                          **CYNTHIA A. FRY, Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**MICHAEL E. VIGIL, Judge**